CLAIRE E. DEWEY, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF WILFRED E. DEWEY, DECEASED, PLAINTIFF-RESPONDENT, v. R.J. REYNOLDS TOBACCO COMPANY, R.J. REYNOLDS INDUSTRIES, INC., AND AMERICAN BRANDS, INC., DEFENDANTS, AND BROWN & WILLIAMSON TOBACCO CORPORATION, DEFENDANT-APPELLANT.

Argued November 9, 1987—Decided February 1, 1988.

202

*Martin London*, a member of the New York bar, argued the cause for appellant (*Norris, McLaughlin & Marcus*, attorneys; *M. Karen Thompson*, on the brief).

*Michael P. Ambrosio* argued the cause for respondent, Claire E. Dewey, Individually and as Executrix of the Estate of Wilfred E. Dewey, Deceased (*Wilentz, Goldman & Spitzer*, attorneys; *Alan M. Darnell, Frederick J. Dennehy*, and *Roger H. McGlynn*, of counsel and on the briefs).

*Peter N. Perretti, Jr.*, argued the cause on behalf of R.J. Reynolds Tobacco Company (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Peter N. Perretti, Jr., Nicholas deB. Katzenbach*, and *Alan E. Kraus*, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This is an action for damages based on theories of products liability and fraud. Plaintiff claims that her husband's death was caused by his cigarette smoking. Defendants are several tobacco and cigarette companies, including Brown & Williamson Tobacco Corporation. The appeal arises from Brown & Williamson's motion to disqualify one of the two firms that represent plaintiff, because of that firm's conflict of interest. The

trial court concluded that there was in fact a conflict. We now review that conclusion in keeping with the provisions of our previous order granting leave to appeal, 108 *N.J.* 198 (1987). See *infra* at 208–209.

The question presented is one of first impression under the Rules of Professional Conduct (RPCs) adopted by this Court in 1984. Resolution of the issue requires us to balance "the need to maintain the highest standards of the [legal] profession" against "a client's right freely to choose his counsel." *Government of India v. Cook Indus., Inc.*, 569 *F.*2d 737, 739 (2d Cir.1978). We have engaged in the required "painstaking analysis of the facts," *Reardon v. Marlayne, Inc.*, 83 *N.J.* 460, 469 (1980) (quoting *United States v. Standard Oil Co.*, 136 *F.Supp.* 345, 367 (S.D.N.Y.1955)), and conclude that although counsel's disqualification ordinarily would be required, such a drastic result in this case would produce undue prejudice to the plaintiff as well as to the judicial system in general. Therefore, despite the most unfortunate departure from the requirements of the RPCs, we order that the challenged representation will be allowed to continue.

I

Plaintiff, Claire Dewey (Dewey), individually and as executrix of her husband's estate, brought this action against several tobacco and cigarette companies, including defendant Brown & Williamson. As indicated, the gist of the action is that Dewey's husband, Wilfred, died of lung cancer, having developed the disease as a result of smoking the defendants' cigarette products.

The complaint was filed in August 1982 by the law firm of Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade (the Budd, Larner firm). Subsequently, the firm of Wilentz, Goldman & Spitzer (the Wilentz, Goldman firm) became co-counsel with Budd, Larner. At all relevant times, Alan Darnell, a shareholder of the Wilentz firm, has been the attorney

primarily responsible for representing plaintiff's interest. A third firm, Porzio, Bromberg & Newman (the Porzio, Bromberg firm), also became co-counsel at the same time, although its involvement ended when the attorney in that firm who was responsible for this case left Porzio, Bromberg and became affiliated with Budd, Larner. These three firms, as co-counsel, have filed eight actions against tobacco companies in the state and federal courts in New Jersey. Brown & Williamson is named as a party in some but not all of those lawsuits.

The instant matter has been actively litigated, including the pursuit of a partially successful motion for summary judgment by Brown & Williamson, see 216 *N.J.Super.* 347 (Law Div. 1987), and an interlocutory appeal therefrom. As of September 30, 1986, attorneys in the Wilentz, Goldman firm had devoted over 1,100 hours to the preparation of this case for trial, and the firm's paralegals had devoted more than 700 additional hours.

As a third-party defendant in two other products liability actions venued in New Jersey, Brown & Williamson previously had been represented by the firm of Rosen, Weiss, Slattery & Burstein (the Rosen firm, since dissolved). In September 1982 Brown & Williamson retained the Rosen firm to represent it in this, the Dewey case. That law firm was also retained to represent Brown & Williamson as a defendant in a second case with allegations similar to those made in this one, and to monitor and assist in the defense of other tobacco cases in which it was not a party.

As of September 1982, the Rosen firm consisted of four partners—Howard Rosen, Sidney Weiss, William Slattery, and George Gelman—and twelve associates. Although it appears that Gelman produced Brown & Williamson as a client initially, Slattery eventually assumed responsibility for this and the other tobacco cases. Weiss primarily handled corporate and commercial transactions, as well as administrative law and

utilities cases. As Slattery admits, Weiss "had no direct responsibility for the smoking and health litigations."

During the period 1982 through 1985, the Rosen firm employed a total of twenty-one attorneys. At any one time, the firm consisted of no more than sixteen and no fewer than eight attorneys. Fifteen attorneys, including Weiss, billed time for legal services to Brown & Williamson during that period, as did six law clerks and five paralegals. Of those fifteen attorneys, four partners and four associates had "significant involvement" with Brown & Williamson files. At least two attorneys devoted a "substantial amount" of time to Brown & Williamson files at all times. There is nothing in the record before us to indicate what is meant by "significant involvement" or a "substantial amount" of time, other than Slattery's certification indicating that he devoted more than half of his time to Brown & Williamson matters in 1984, and more than three-quarters of his time to that client in 1985.

From March 1981 through November 1985, Brown & Williamson paid the Rosen firm substantial fees. During the calendar years 1983, 1984, and 1985 the Brown & Williamson billings represented approximately five, ten, and twenty per cent, respectively, of the firm's revenues. The firm divided its net profits among its members, and Weiss shared accordingly in those profits.

On November 15, 1985, more than three years after the instant litigation was commenced, Slattery left the Rosen firm and became a partner at the firm of Norris, McLaughlin & Marcus (the Norris, McLaughlin firm), taking Brown & Williamson with him as a client. Appropriate Substitutions of Attorneys were filed, and the Norris, McLaughlin firm has remained as defense counsel for Brown & Williamson in this and other cases since that date.

In May 1986 Weiss left the Rosen firm and became a partner in the Wilentz, Goldman firm. Since joining that firm, Weiss has had no involvement in tobacco cases, nor has he had any

discussions with anyone in the firm regarding the merits of any tobacco cases.

There is some dispute about whether Slattery learned of Weiss's intended affiliation with the Wilentz, Goldman firm prior or subsequent to Weiss's relocation. At no time did Weiss or anyone at the Wilentz, Goldman firm seek Brown & Williamson's consent to the Wilentz, Goldman firm's continuing as counsel for plaintiff.

On September 3, 1986, New York counsel for Brown & Williamson sent a letter to Darnell requesting that the Wilentz, Goldman firm voluntarily withdraw as counsel for plaintiff because of Weiss's affiliation with that firm. Following Wilentz, Goldman's refusal to withdraw, Brown & Williamson moved for that firm's disqualification. After oral argument on the motion the trial court ruled that an evidentiary hearing was required.

After granting Brown & Williamson's motion for leave to appeal, the Appellate Division summarily affirmed, directing that the evidentiary hearing proceed but that "any inquiry be limited to determine whether the former client [Brown & Williamson] has established the requisites of criteria (2) and (3)" set forth in *Reardon v. Marlayne, Inc., supra*, 83 *N.J.* at 474. In *Reardon* we devised a three-part test for determining whether an attorney should be disqualified from successive representation of an adverse interest. We summarized the disqualifying circumstances as follows:

(1) a prior attorney-client relationship between the former client and the attorney sought to be disqualified;

(2) a substantial relationship or a reasonable perception, from the public's perspective, of a substantial relationship between the subject matter of the present suit and that of cases worked on during the former representation;

(3) access to relevant confidences of the former client, which may be proved by other than direct evidence, leading to a conclusive presumption of the attorney's knowledge of such confidences. [*Ibid.*]

Thereafter the trial court, without a hearing, ordered the disqualification of the Wilentz, Goldman firm. Plaintiff obtained leave to appeal in the Appellate Division, and a different

panel of that court remanded the matter to the trial court for factual findings on "whether Mr. Weiss * * * had actually acquired information protected by confidentiality which is material to the matter. See RPC 1.10(b)." The Appellate Division granted Brown & Williamson's motion to stay its order remanding the case, after which this Court granted Brown & Williamson's motion for leave to appeal. 108 *N.J.* 198 (1987). (It is for that reason that despite the trial court's ultimate conclusion favoring Brown & Williamson's position, which is the subject of review here, Brown & Williamson is nevertheless denominated the appellant in this Court.)

We remanded the case once again to the trial court for its "factual determinations regarding the disqualification motion[ ] before this Court * * * with the trial court's determination to include whether Attorney Weiss, during the time he and Slattery were partners, had actually acquired confidential or privileged information" about this case, 108 *N.J.* at 199, those findings to be filed with this Court, with opportunity for the parties thereafter to file "any exceptions to or comments [thereon]." *Ibid.* On July 6, 1987, both Weiss and Slattery testified at an evidentiary hearing. Several documents, primarily bills and memoranda from the Rosen firm, were admitted into evidence.

The trial court found that Weiss had some "peripheral exposure" to the tobacco cases as follows: (1) after attending a tobacco litigation seminar, Slattery told Weiss that he had learned a new word—"epidemiology"—and "commented that there were flaws in statistical evidence and that there appears to be lack of proof of causation"; (2) the only pleading signed by Weiss was the Substitution of Attorney at the time Slattery joined the Norris, McLaughlin firm; (3) Weiss participated in discussions regarding "the feasibility of purchasing a computer for [the Rosen firm's] use and for aid in the Brown & Williamson cases"; (4) Slattery, a member of a special committee of tobacco company defense lawyers, spoke with Weiss in connection with two of that committee's projects: (a) Slattery asked

Weiss for assistance in communicating with a potential witness, and (b) Slattery discussed with Weiss the availability of another Rosen partner to assist Slattery in preparing a memorandum to be submitted to the committee; and (5) Slattery told Weiss that a mock trial had been held in another tobacco case.

The trial court also found that Weiss had "direct involvement" in Brown & Williamson matters on two occasions:

█ On May 23, 1985, Weiss spent .50 hour researching the law to determine whether the amendment to the comparative negligence law was retroactive. Brown & Williamson was billed * * *.

█ On November 1, 1983, [Weiss] devoted .70 hour to determine whether the representation of a prospective client, in an asbestos litigation would create a conflict of interest regarding the Dewey case. Brown & Williamson was billed * * *.

The court concluded that Weiss's research regarding the comparative negligence statute did "not constitute a confidential or privileged communication by reason of the fact that any lawyer in the preparation of any tort case would perform that research or have that knowledge." However, the court determined that Weiss's approach to Slattery regarding the potential conflict of interest indicated an awareness of Brown & Williamson's alternative causation defense, which was "one of the Brown & Williamson defense confidences." The court found that Weiss's "responsibility for making a determination of the question puts Weiss in the position of having knowledge of the Brown & Williamson case file."

After the trial court's findings were filed with this Court, we granted defendant R.J. Reynolds Tobacco Company's application to file a brief and participate in oral argument in this Court.

## II

Brown & Williamson argues that disqualification of the Wilentz, Goldman firm is mandated under two distinct lines of analysis. First, defendant seeks disqualification of the Wilentz, Goldman firm under the general "appearance of impropriety" doctrine that had long been applied by this Court prior to the

adoption of the current RPCs in 1984. *See, e.g., Matter of Petition for Review of Opinion No. 569,* 103 *N.J.* 325, 329–30 (1986), and the authorities cited therein. Under that doctrine

an *actual* conflict of interest or ethical violation is not always necessary to disqualify an attorney when he acts as an adversary against a former or existing client. * * * The "appearance" doctrine is intended not to prevent any actual conflicts of interest but to bolster the public's confidence in the integrity of the legal profession. [*Id.* at 330.]

Brown & Williamson further argues that once an appearance of impropriety has been shown, an irrebuttable presumption arises that confidential information has been passed between the client and the attorney whose disqualification is sought. *See Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 473–74.

In the alternative, Brown & Williamson argues that disqualification is compelled by both paragraph (b) and paragraph (d) of RPC 1.10, which provide as follows:

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by RPC 1.6 and 1.9(b) that is material to the matter.

\*       \*       \*       \*       \*       \*       \*       \*

(d) When lawyers terminate an association in a firm, none of them, nor any other lawyer with whom any of them subsequently becomes associated, shall knowingly represent a client when doing so involves a material risk of violating RPC 1.6 or 1.9.

Defendant further contends that the "appearance of impropriety" doctrine is vicariously incorporated in paragraphs (b) and (d) by their respective references to RPC 1.9(b) and 1.9. RPC 1.9(b) in turn specifically incorporates the provisions of RPC 1.7(c), which provides as follows:

This rule shall not alter the effect of case law or ethics opinions to the effect that:

(1) In certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the

facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

Plaintiff responds that disqualification is not warranted absent Weiss's actual acquisition of protected information while at the Rosen firm. Plaintiff also challenges Brown & Williamson's contention that the general "appearance of impropriety" doctrine still prevails, and asserts that RPC 1.10(b) governs this case. Plaintiff further argues that because the Weiss and Slattery certifications below differed sharply on whether Weiss actually obtained client confidences, an evidentiary hearing was mandated by RPC 1.10(b).

On the record before us, we are not convinced that either party's position is entirely correct. For example, it has been argued that *Reardon v. Marlayne, Inc., supra*, 83 *N.J.* 460, governs the resolution of this case. We think not. In that case we stated a three-part test, recited *supra* at 208, for determining whether an attorney should be disqualified based on his or her successive representation of adverse interests. That test was created in the absence of any Disciplinary Rule directly on point. *Id.* 83 *N.J.* at 470; see *infra* at 213. Because the RPCs contain provisions expressly designed to resolve that question, we conclude that the *Reardon* three-part test no longer controls. We begin our analysis by asking whether Weiss himself is disqualified under RPC 1.9 from representing Dewey in this case. If he is, we must then decide whether any such personal disqualification should disqualify the Wilentz, Goldman firm under RPC 1.10.

A

If Weiss "represented" Brown & Williamson while at the Rosen firm, then by operation of RPC 1.9(a)(1) he is precluded from representing Dewey in the same matter. This prohibition is consistent with that reached under our case law prior to the

adoption of the RPCs. See *Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 470, and the authorities cited therein.

RPC 1.9 provides as follows:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.

As initially proposed by the American Bar Association, Model Rule 1.9 was a new provision without a counterpart in the Code of Professional Responsibility. *See* ABA Model Rule 1.9 comment, in G. Hazard and W. Hodes, *The Law of Lawyering* 612 (1986); RPC 1.9 comment, 114 *N.J.L.J.,* July 19, 1984, Supp. 4. The situations covered by this Rule previously had been dealt with under Canon 9 of the Code of Professional Responsibility ("A Lawyer Should Avoid Even the Appearance of Impropriety") and DR 9–101 ("Avoiding Even the Appearance of Impropriety"). In its report on the Model Rules this Court's Committee on the Model Rules of Professional Conduct [hereinafter the Debevoise Committee] recommended that this Court adopt the Model Rule with only one suggested change, namely, the current provision in RPC 1.9(a)(1) that the tainted attorney can subsequently represent an adverse client only "after full disclosure of the circumstances." See 112 *N.J.L.J.,* July 28, 1983, Supp. 7. As the Committee noted, the Model Rule was intended to eliminate the "appearance of impropriety" analysis previously used to resolve these types of cases, *e.g., Reardon v. Marlayne, Inc., supra,* 83 *N.J.* 460. *See* 112 *N.J.L.J.,* July 28, 1983, Supp. 7; *see also* G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 176.1 ("The Model Rules avoid the Canon 9 expression 'appearance of impropriety,' because it is too vague a standard for discipline.").

■ However, this Court added a new paragraph (b) to the Model Rule specifically incorporating the provisions of RPC 1.7(c), *supra* at 211–212, in situations covered by RPC 1.9. Contrary to the recommendation of the Debevoise Committee, this Court added paragraph (c) to the Model Rule 1.7 to preserve in certain instances the "appearance of impropriety" doctrine. See RPC 1.7 comment, 114 *N.J.L.J.*, July 19, 1984, Supp. 4; 112 *N.J.L.J.*, July 28, 1983, Supp. 6. That doctrine therefore has continuing vitality in this state in situations covered by RPC 1.7, and in those situations covered by other Rules that incorporate RPC 1.7, *e.g.*, RPC 1.9. Thus it is apparent that the "appearance of impropriety" doctrine is relevant to the determination of whether an attorney has "represented" a client and is therefore prohibited from subsequently representing a different client with interests that are adverse to those of the first.

The term "represented" is not defined in RPC 1.9, nor is it defined elsewhere in the Model Rules or in the New Jersey RPCs. *See, e.g.,* "Terminology," G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 580–81. The ABA, in defining the scope of the Model Rules, indicated that

> [t]he Rules presuppose a larger legal context shaping the lawyer's role. That context includes court rules and statutes relating to licensure, laws defining specific obligations of lawyers and substantive and procedural law in general.
> * * *
> Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine whether a client-lawyer relationship exists.
> [G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 578.]

We look then to the "larger legal context" in our effort to define representation.

Before our adoption of the RPCs in 1984 the relevant case law and the Opinions of the Supreme Court Advisory Committee on Professional Ethics would have compelled the conclusion that Weiss represented Brown & Williamson while he was a partner at the Rosen firm. Those decisions were based not on the attorney's actual involvement with the former client's file,

but rather on his or her mere affiliation with the adversary's firm. *See* Opinion No. 43, 87 *N.J.L.J.* 285 (1964) (prohibiting inquirer from representing clients in pending matrimonial actions when recently-hired associate previously had been employed in adversary's firm, "even though the employee may not have been engaged in this particular matter"); Opinion No. 128, 91 *N.J.L.J.* 309 (1968) (prohibiting inquirer from representing the husband in a divorce action after dissolution of the partnership when wife had consulted inquirer's former partner many years earlier, even when no client confidences had been disclosed to the inquirer: "[f]or all intents and purposes, the client of one partner is a client of all the partners"); Opinion No. 525, 113 *N.J.L.J.* 365 (1984) ("[c]learly a lawyer and the firm he joins will be disqualified from handling a case in which the prior firm was or is engaged. The reason is obvious: even if no confidences were obtained or there is no actual conflict, the presumption otherwise is irrebuttable. Further, the appearance of impropriety is pervasive."); *see also State v. Bellucci*, 81 *N.J.* 531, 541 (1980) ("[e]ach partner's professional knowledge is justifiably imputed to the entire firm, regardless of actual disclosure"). The *Bellucci* case provided an additional rationale for disqualifying Weiss, *i.e.,* his financial interest as a partner in the Rosen firm's extensive representation of Brown & Williamson: "The shared economic interest of the entire firm in the clients of individual members also supports treating a partnership as one attorney." *Ibid.*

The authorities cited above predate this Court's adoption of the Rules of Professional Conduct. The question then becomes whether the analysis here should be different under those Rules, or whether Weiss should be disqualified *per se* simply because of his status as a partner in the Rosen firm.

█ We conclude that under RPC 1.9 a mandatory disqualification is no longer required. We reach that result from RPC 1.9(b)'s incorporation of RPC 1.7(c)'s "appearance of impropriety" analysis. Under that analysis the question to be resolved is

whether "an ordinary knowledgeable citizen acquainted with the facts" could conclude that Weiss represented Brown & Williamson within the intendment of RPC 1.9, and that Weiss's representation of Dewey in the same lawsuit would pose a "substantial risk of disservice either to the public interest or the interest of one of the clients." RPC 1.7(c)(2).

Brown & Williamson retained the Rosen firm from 1981 through 1985 to represent it in a number of cases. Brown & Williamson was a substantial client, accounting for up to twenty percent of the firm's revenues in 1985. As one of four or five partners of the Rosen firm, Weiss personally shared in the income derived from that firm's representation of Brown & Williamson. Three-quarters of the attorneys employed by the firm billed some time to Brown & Williamson during the relevant time period, as did a number of the firm's law clerks and paralegals. One-third of the attorneys had "significant involvement" with Brown & Williamson files. Weiss himself billed time to the client, performing legal research and resolving a question of a possible conflict of interest with a potential client. He had conversations with the lead attorney, Slattery, concerning Slattery's activities on the Brown & Williamson files. Weiss discussed with Slattery the possible retention of a particular witness. They discussed the availability of another partner of the firm to assist Slattery in preparing a memorandum concerning the admissibility of certain testimony. Weiss had discussions with other members of the firm concerning the acquisition of a computer system to be used, among other things, to access a tobacco company defense communication and information network. As we stated in *Higgins v. Advisory Committee on Professional Ethics*, 73 *N.J.* 123, 129 (1977), "the 'appearance' of impropriety must be something more than a fanciful possibility. It must have a reasonable basis." This record amply demonstrates such a "reasonable basis" for finding that Weiss represented Brown & Williamson. We therefore conclude that Weiss should be disqualified under RPC 1.9(a) from representing Dewey.

In reaching that conclusion, we emphasize the fundamental importance of the attorney's obligation to preserve the client's confidences. As we stated in *Reardon,*

[t]he ethical obligation of every attorney to preserve the confidences and secrets of a client is basic to the legitimate practice of law. Such an obligation is necessary for several reasons. Persons who seek legal advice must be assured that the secrets and confidences they repose with their attorney will remain with their attorney, and their attorney alone. Preserving the sanctity of confidentiality of a client's disclosures to his attorney will encourage an open atmosphere of trust, thus enabling the attorney to do the best job he can for the client. [83 *N.J.* at 470.]

## B

Our conclusion that Weiss represented Brown & Williamson ordinarily would mandate the disqualification of the Wilentz, Goldman firm under RPC 1.10(a): "When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by * * * RPC 1.9 * * *." As explained in G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 191, this provision "applies a *per se* rule of imputed disqualification to lawyers *currently* practicing together in close association, without regard to whether there has been an actual sharing of client confidences. This situation presents the clearest case for imputed disqualification, and therefore the strictest rule is applied." That result is entirely consistent with the result reached in our cases prior to the adoption of the RPCs. *E.g., Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 470–71 ("[i]f one attorney in the firm is disqualified, the entire firm is precluded from representing the client in that suit"), and the authorities cited therein.

Because of our conclusion that RPC 1.10(a) is the relevant provision in this case, we need not address the parties' arguments concerning RPC 1.10(b) and (d), other than to correct the reference in RPC 1.10(b) to "RPC 1.9(b)." As noted above, this Court added a new paragraph (b) to the Model Rule 1.9, thereby incorporating RPC 1.7(c)'s "appearance of impropriety" analy-

sis. The reference in 1.10(b) is to the Model Rule 1.9(b), which we adopted in New Jersey as RPC 1.9(a)(2). Therefore RPC 1.10(b) should be corrected to read in pertinent part as follows: "and about whom the lawyer had acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter."

If this were the end of our inquiry, we would be constrained to order the disqualification of the Wilentz, Goldman firm. However, as noted above, a motion for disqualification calls for us to balance competing interests, weighing the "need to maintain the highest standards of the profession" against "a client's right freely to choose his counsel." *Government of India v. Cook Indus., Inc., supra,* 569 *F.*2d at 739; *accord Silver Chrysler, Inc. v. Chrysler Motors Corp.,* 518 *F.*2d 751, 753 (2d Cir.1975); *Emle Indus., Inc. v. Patentex, Inc.,* 478 *F.*2d 562, 564–65 (2d Cir.1973). Having concluded that Weiss's prior representation of Brown & Williamson requires the disqualification of the Wilentz, Goldman firm, we now must weigh that conclusion against Dewey's interest in being represented by counsel of her choice.

We recognize that a person's right to retain counsel of his or her choice is limited in that "there is no right to demand to be represented by an attorney disqualified because of an ethical requirement." *Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 477; *State v. Lucarello,* 135 *N.J.Super.* 347, 353 (App.Div.), aff'd o.b., 69 *N.J.* 31 (1975). We observe as well that disqualification motions are often made for tactical reasons, but that "even when made in the best of faith, such [disqualification] motions inevitably cause delay" in the underlying proceedings. *Evans v. Artek Systems Corp.,* 715 *F.*2d 788, 792 (2d Cir.1983) (quoting *Board of Educ. v. Nyquist,* 590 *F.*2d 1241, 1246 (2d Cir.1979)). The complaint in this matter was filed by Budd, Larner in 1982. Wilentz, Goldman became co-counsel in 1983. As of September 1986 that firm's attorneys and paralegals had expended more than 1,800 hours preparing this case for trial. They have undoubtedly expended many hundreds more since that time. By that September 1986 date thirty-nine witnesses

had been deposed, and Wilentz, Goldman attorneys had attended all but three of those depositions. Other depositions were scheduled to be taken after that date. Alan Darnell, the Wilentz, Goldman attorney charged with responsibility for this case, filed an affidavit below indicating that, as one might expect in complex litigation, plaintiff's co-counsel have allocated different aspects of the case between themselves. Darnell properly questions whether at this late date, with trial fast approaching, another attorney could effectively master the complicated technical aspects of the case entrusted to him, or whether another attorney could develop the knowledge of and personal relationship with the various witnesses and with the plaintiff herself.

As already indicated, had Brown & Williamson's appeal reached us at an earlier juncture, we unquestionably would have upheld the disqualification of the Wilentz, Goldman firm for the reasons set forth above. We believe, however, that an order disqualifying counsel on the eve of trial would do more to erode the confidence of the public in the legal profession and the judicial process than would an order allowing the firm to continue its representation of the plaintiff. We therefore conclude that the Wilentz, Goldman firm should continue that representation.

A condition of that representation, however, is that it is to be furnished without compensation for any services to be rendered henceforth, particularly including any services in connection with trial or other final disposition of the matter. It is, after all, the failure of Weiss and his new firm to have addressed the obvious ethical implications of their association that has created the awkward situation now confronting us—a failure that but for the Court's overriding concern for the firm's client would result in immediate compelled withdrawal of the firm from this case. We cannot undo the conflict that has preceded our disposition of the matter, nor can we correct the tainted representation without unduly harming the client; but we can pre-

vent those responsible for this sorry state of affairs from profiting from their disregard of the RPCs.

We assume that the firms representing plaintiff—Wilentz, Goldman and Budd, Larner—have a contingent fee arrangement with plaintiff in keeping with *Rule* 1:21-7. In the event plaintiff recovers, either by verdict or settlement, the distribution of so much of the recovery as represents counsel's fee is to be subject to the approval of the trial court. Wilentz, Goldman will be entitled to a fee for services performed up to the date of this opinion, calculated on any reasonable basis (one geared to an hourly charge comes immediately to mind, but there may be others). So much of the balance as would ordinarily be included in that firm's fee will be retained by plaintiff.

Finally, we underscore the fact-sensitive nature of today's decision. Our disqualification of Weiss is based on our analysis of the facts before us. It may very well be that on a different factual record a different analysis might be resorted to and a different result might be required. *See, infra* at 221–22; *see also Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 475 (recognizing that associate at large law firm might not be in possession of protected information of all clients of the firm); RPC 1.10(b) (providing for inquiry into side-switching attorney's acquisition of material information that is protected by RPC 1.6 and RPC 1.9(a)(2)); Opinion No. 525, *supra,* 113 *N.J.L.J.* at 383 (listing factors to be considered in determining whether side-switching attorney should be disqualified).

We also emphasize that only in extraordinary cases should a client's right to counsel of his or her choice outweigh the need to maintain the highest standards of the profession. We cannot conceive of any situation in which the side-switching attorney or his new firm would be permitted to continue representation if, unlike the situation before us, the attorney had in fact *actually* represented the former client or had acquired confidential information concerning that client's affairs. We continue to adhere to the view expressed in *Reardon* that

problems of the job market and mobility are not solved by loosening ethical standards required of the profession. The rules of professional behavior are not branches which bend and sway in the winds of the job market and changes· in the size and location of law firms. Rather, the rules must be the bedrock of professional conduct. [83 *N.J.* at 475.]

## III

Under any circumstances the disqualification of an attorney in pending litigation does a great disservice to the affected client. As well, the delay caused by such disqualification has an impact not only on the other parties to the affected litigation but on the efficiency of the judicial system. That circumstance commends our giving the bar and the trial courts some guidance regarding procedures to be followed when faced with a situation such as that presented in the instant matter.

Undoubtedly this appeal and the underlying motion for disqualification have required the expenditure of a significant amount of time and resources by the parties and by the judicial system. Such an expenditure could have been avoided. Under RPC 1.9(a)(1) the Wilentz, Goldman firm, in anticipation of Weiss's joining the firm, could have sought Brown & Williamson's consent to Wilentz, Goldman's continued representation of the plaintiff. Failing consent, Weiss and the Wilentz, Goldman firm could have decided to defer Weiss's shift. The first approach—that of seeking consent—was not pursued, nor is there any suggestion in the record before us that the second—deferral—was even considered, despite the obvious potential for the question of conflict coming to the surface. We suggest that it does not require any remarkable sensitivity to recognize the ethical ramifications implicit in the circumstances of many lawyer-shifting situations. When those ramifications are perceived, as surely they should have been here, the approaches referred to above should receive the thoughtful attention of the lawyers and firms involved.

In the event a motion is brought to disqualify an attorney because of his or her alleged representation of con-

flicting interests in the same or substantially related matters, the former client should have the initial burden of proving that by application of RPC 1.9 it previously had been represented by the attorney whose disqualification is sought. *See Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 474 (the former client has burden of showing that three-part test is met). Such a motion should ordinarily be decided on the affidavits and documentary evidence submitted, and an evidentiary hearing should be held only when the court cannot with confidence decide the issue on the basis of the information contained in those papers, as, for instance, when despite that information there remain gaps that must be filled before a factfinder can with a sense of assurance render a determination, or when there looms a question of witness credibility. If the court finds that the attorney has represented the former client, then that attorney and any firm with which he or she has become affiliated should be disqualified from representing the adverse party. RPC 1.10(a).

■ If the court concludes that the side-switching attorney has not represented the former client, then it must determine whether the attorney whose disqualification is sought has "acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter." RPC 1.10(b). The burden at that point shifts to that attorney to show that no protected information has been acquired. *See* ABA Model Rule 1.10 comment, G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 617. Again, a hearing should be held only when it is indispensable to resolution of the issue.

■ If the court concludes that disqualification is required under either RPC 1.9 or RPC 1.10(b), it must then weigh that conclusion against the affected client's right to counsel of his or her choice. We repeat our admonition expressed above at 220 that in only the most unusual case will the client's right prevail. This is an example of just such a case.

We adopt the foregoing procedure in respect of a hearing because of our concern regarding the attorney's obligation to

protect client confidences and the potential for the disclosure of such confidences in this type of proceeding. Any inquiry into an attorney's actual acquisition of protected information is a "last resort" device, to be engaged in only when, for the integrity of the ultimate decision, it becomes absolutely necessary to run the risk of "revelation of secrets and information[,] which it is the purpose of the [RPCs] to protect." *Reardon v. Marlayne, Inc., supra,* 83 *N.J.* at 473.

## IV

Because of the compelling circumstances of this case we conclude that despite the Wilentz, Goldman firm's position of conflict as established under the RPCs, that firm is to continue its representation of plaintiff under the conditions imposed by this opinion. See *supra* at 219–220.

So ordered.

*For modification*—Justices CLIFFORD, HANDLER, O'HERN and STEIN and Judges ANTELL and KING—6.

*Opposed*—None.